J44ACASCps

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                         19-cr-193 (DLC)

RICHARD CASTRO and
LUIS FERNANDEZ,

               Defendants.         Conference

------------------------------x

                              New York, N.Y.
                              April 4, 2019
                              3:40 p.m.

Before:

                  HON. DENISE L. COTE

                             District Judge

                    APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
BY:  ALINE R. FLODR, ESQ.
     RYAN B. FINKEL, ESQ.
     Assistant United States Attorneys

O'BRIEN HATFIELD, P.A.
     Attorneys for Defendant Castro
BY:  MARK J. O'BRIEN, ESQ.

DONALD H. VOGELMAN, ESQ.
     Attorney for Defendant Fernandez

Also Present:  Joseph J. Azzata
                Special Agent, Federal Bureau of Investigation

                Mohammed Ahmed
                Pretrial Services Officer

1          (Case called)

2          THE CLERK:  Is the government ready to proceed?

3          MS. FLODR:  Yes, your Honor.  Aline Flodr and Ryan

4   Finkel on behalf of the United States.  And with us at counsel

5   table is Special Agent Joseph Azzata.

6          THE CLERK:  Thank you.

7          For the defendant, Richard Castro, are you ready to

8   proceed?

9          MR. O'BRIEN:  Yes, your Honor.  May it please the

10  Court, my name is Mark O'Brien.  Seated to my right, your left,

11  is Richard Castro.

12         THE CLERK:  Thank you.  For the defendant, Luis

13  Fernandez, are you ready to proceed?

14         MR. VOGELMAN:  Yes, your Honor.  My name is Donald

15  Vogelman.  I represent Luis Fernandez.  And he is seated to my

16  right.  Good afternoon, your Honor.

17         THE COURT:  Good afternoon, everyone.  Just give me

18  one minute here.

19         Mr. Vogelman, your name isn't on my appearance sheet.

20  Is there a reason for that?

21         MR. VOGELMAN:  I filed a notice of appearance through

22  ECF, and I have confirmation of that.  I just was retained

23  yesterday.  I also work -- in my suite is Andrew Mancilla and

24  Robert Fantone.  They're two lawyers that actually, when I was

25  retained, they met with the family and they filed notices also

 1    in this case.  But I'm going to be the lead attorney and I did

 2    file a notice.

 3         THE COURT:  OK.  Thank you.  My deputy has checked.

 4    We have the other names but not yours.  But she has checked on

 5    ECF and we now have a record of it.  Thank you.

 6         MR. VOGELMAN:  Thank you, Judge.

 7         THE COURT:  OK.  I'll take a report from you,

 8    Ms. Flodr.

 9         MS. FLODR:  Yes, your Honor.  This case concerns a

10    conspiracy that existed between on or about November 2015 and

11    until March 2019.  And it consisted of Mr. Castro and

12    Mr. Fernandez conspiring to distribute carfentanyl, fentanyl,

13    and phenyl fentanyl, which are some of the most dangerous

14    opioids sold today.  Fentanyl is an opioid that is much more

15    powerful than heroin.  And carfentanyl is a fentanyl analogue

16    that is approximately a hundred times more potent then fentanyl

17    and approximately one thousand times more powerful than heroin.

18         The conspiracy dealt these drugs in two ways.  First,

19    they sold drugs over the dark web, over dark web marketplaces

20    that are consistent with like Amazon except operating on the

21    dark web.  And, second, they shifted it off of these dark web

22    marketplaces and started to take drug orders over e-mail,

23    specifically an encrypted e-mail address.

24         For most of this period, the conspiracy dealt drugs

25    using the monikers Chemsusa, Chems underscore usa, and Chemical

1  underscore usa.  Defendant Richard Castro was an online

2  operator of these monikers and was paid in bitcoin for the

3  narcotics that he was selling.

4        On one dark net marketplace, Dream Market, Chemsusa

5  boasted that it had sold and completed more than 3200 narcotics

6  transactions over dark web marketplaces, including 1800 over

7  AlphaBay.  In June 2018, Chemsusa informed its customers on

8  Dream Market that he was moving its business off of these dark

9  net marketplaces and would start accepting purchases only

10 through an encrypted e-mail address.  To learn that off market

11 e-mail address, Chemsusa required willing customers from these

12 marketplaces to pay a fee.  An undercover law enforcement agent

13 participating in our investigation paid that fee, obtained that

14 encrypted e-mail address, and then started placing orders with

15 Castro through that e-mail address.

16       Castro's co-conspirator here, Mr. Fernandez, shipped

17 narcotics on behalf of the conspiracy, including from New York

18 City.

19       From November 2018 to the beginning of March 2019, at

20 least 94 packages have been linked to this conspiracy.  Several

21 of them have been searched through search warrants and have now

22 tested positive for carfentanyl or fentanyl.

23       Fernandez was caught on video dropping off some of

24 these packages in December of 2018.  All of these packages were

25 shipped through the U.S. Postal Service using USPS Priority

1  Mail envelopes.  And for most of them the sender's purported

2  return address was a law office or a governmental entity, which

3  we believe was meant to prevent holders of those packages from

4  opening those packages for fear that it might contain

5  privileged material or otherwise confidential material.

6          THE COURT:  Did you say the return addresses were?

7          MS. FLODR:  The purported sender addresses, your

8  Honor.

9          THE COURT:  OK.

10         MS. FLODR:  Using the mail in this way exposed many

11 innocent parties to unknowingly handle these packages without

12 knowing the full dangerous contents that were inside of these

13 packages.  Castro also laundered his narcotics proceeds,

14 including by funneling more than approximately $1.7 million

15 through several bitcoin wallets he owned, and by buying

16 valuables which were shipped to his residence in Florida.

17         Castro was arrested on March 12, 2019 in Florida.  A

18 search of his home revealed approximately nine guns, including

19 a gun in his bedroom, and approximately $17,000 in cash, also

20 found in his bedroom.  A search of his office in that same home

21 revealed a remaining eight guns, near two safes, and in those

22 safes were private keys to multiple bitcoin wallets.

23         THE COURT:  So nine guns plus eight guns, are you

24 saying?

25         MS. FLODR:  It was nine guns in total, your Honor.

1          THE COURT:  Thank you.

2          MS. FLODR:  Some of these guns were AR-15s, and at

3   least one gun was an illegal firearm.

4          Castro's guns, the government proffers, were believed

5   to have protected his drug proceeds.

6          Fernandez was also arrested on March 12th, 2019 after

7   voluntarily surrendering.  A search of Fernandez's mother's

8   apartment, where Fernandez resided, revealed labels consistent

9   with the names and addresses of customers of the conspiracy, 88

10  grams of substances that field tested positive for fentanyl,

11  and 26 grams of substances that field tested positive for

12  cocaine.

13         There was an additional 582 grams of substances found

14  in Fernandez's room in that apartment, which the agents also

15  believed to be consistent with narcotics, but that 582 grams

16  has yet to be tested.

17         Lastly, the agents also recovered a gun from the

18  apartment which a witness in the apartment indicated belonged

19  to Mr. Fernandez.

20         On the same day that Castro and Fernandez were

21  arrested, law enforcement approached over a dozen individuals

22  who were believed to be customers of the conspiracy.  Evidence

23  obtained from statements and documents from those customers

24  show that those customers bought carfentanyl, fentanyl, and

25  phenyl fentanyl from Chemsusa through dark web marketplaces,

1  and then, as with the undercover agent, transitioned to buying

2  those same types of drugs from the conspiracy through the

3  encrypted e-mail address, the same encrypted e-mail address

4  that had been provided to the undercover agent.

5         Castro and Fernandez were indicted on March 19, 2019,

6  in a three-count indictment, and this Court granted an

7  exclusion of time under the Speedy Trial Act from March 22,

8  2019 through today's conference.  At most, by the government's

9  calculation, three days have elapsed off of the Speedy Trial

10  clock.

11         THE COURT:  And I believe we put the conference over

12  until today so that the defendant, who was arrested in Florida,

13  could arrive in the district and counsel could be present for

14  him.  Am I correct?

15         MS. FLODR:  That is correct, your Honor.

16         THE COURT:  Good.

17         If this case went to trial, how long does the

18  government expect the trial would last?

19         MS. FLODR:  Your Honor, the government approximates

20  about one and a half to two weeks for the government's case.

21         THE COURT:  And in addition to what you have described

22  already in setting forth the case, what are any other sources

23  of evidence, principal sources of the evidence that the

24  government expects to offer at trial?

25         MS. FLODR:  In addition to the types of evidence

J44ACASCps

1    already described, there is also GPS location data and

2    telephone records for each of the defendants.  The government

3    is also waiting on the returns of a multi -- a treaty request

4    for assistance from Finland regarding a cryptocurrency exchange

5    that Mr. Castro was believed to have used in order to

6    facilitate receiving narcotics proceeds and laundering those

7    proceeds.  And in addition, through all of the premises

8    searches that we have completed, we have at this point seized

9    many, many electronic devices that will need to be imaged and

10   will need to be reviewed pursuant to the search warrants under

11   which those items were seized.

12           And lastly, your Honor, we have also obtained search

13   warrants on an e-mail account associated with Mr. Castro, and

14   the return from that search would also be principal evidence

15   that the government would rely on at trial.

16           THE COURT:  Were there post-arrest statements?

17           MS. FLODR:  Your Honor, Mr. Castro did not make any

18   post-arrest statements, but Mr. Fernandez did, after he was

19   Mirandized and waived his *Miranda* rights.

20           THE COURT:  Let me begin by arraigning the defendants

21   on the indictment.  I believe it bears the number 19-cr-193.

22   Is that correct, counsel?

23           MS. FLODR:  Yes, your Honor.

24           THE COURT:  Thank you.

25           I would ask both defendants, please, to stand.  I'm

1  going to ask you three questions: have you received a copy of

2  the indictment; do you wish me to read it to you; how do you

3  plead, guilty or not guilty.

4          So I will begin with you, Mr. Castro.  Have you

5  received a copy of the indictment, 19-cr-193?

6          DEFENDANT CASTRO:  Yes.

7          THE COURT:  Mr. Fernandez?

8          DEFENDANT FERNANDEZ:  Yes.

9          THE COURT:  Mr. Castro, do you wish me to read it to

10  you?

11          DEFENDANT CASTRO:  No.

12          THE COURT:  Mr. Fernandez?

13          DEFENDANT FERNANDEZ:  No.

14          THE COURT:  Mr. Castro, how do you plead?  Guilty or

15  not guilty?

16          DEFENDANT CASTRO:  Not guilty.

17          THE COURT:  Mr. Fernandez, how do you plead?  Guilty

18  or not guilty?

19          DEFENDANT FERNANDEZ:  Not guilty.

20          THE COURT:  You may be seated.

21          So have counsel discussed a schedule for trial?

22          MS. FLODR:  Yes, your Honor.  We have conferred before

23  today's conference, and while the parties agree that a trial

24  date the second week of November would work for all parties,

25  it's the government's understanding that the defense would

J44ACASCps

1   prefer the end of January of 2020.

2               THE COURT:  So when in November?  I'm sorry?

3               MS. FLODR:  The second week of November.

4               THE COURT:  Well, the second week in November begins

5   on November 11th.  That's a court holiday.  So the trial will

6   begin on November 12th.  But I understand, I think I understand

7   from the government, that the defendants would prefer not to go

8   to trial in November.  They would prefer to go to trial early

9   next year.

10              MR. O'BRIEN:  Your Honor, as to Mr. Castro -- my name

11  is Mark O'Brien -- I am ready in November.  I am also, at the

12  Court's convenience, ready in January of 2020.

13              MR. VOGELMAN:  Your Honor, I did speak to the

14  government and Ms. O'Brien, and honestly January is much better

15  because my daughter is getting married December 14th.  My wife

16  and I are throwing the wedding.  I'm being honest with the

17  Court.  A lot of people are coming in from out of town.  And

18  since there's voluminous discovery in this case, I want to be

19  able to prepare, if it goes to trial.  And I don't want to feel

20  squeezed, as this is a case where there's a lot of evidence

21  that people have.  And I discussed this with my client, who

22  right now is incarcerated.  I've discussed this with co-counsel

23  and the government.  So I'm giving you the most honest answer I

24  can.  I would really rather go in January for that reason.

25              THE COURT:  OK.  Well, I appreciate that.  And

J44ACASCps

1    congratulations on your daughter's wedding.  But it's December.

2    And this is going to be a short trial.  And you're choosing a

3    period of time where you're expecting the trial to be over

4    before Thanksgiving.  Otherwise we would start the week before.

5    We would start the first week in November.  So my understanding

6    from counsel is, they expect this trial to be done by November

7    22nd.  Otherwise we're going to start November 4th.

8         MS. FLODR:  Your Honor, the only -- the government is

9    prepared to go to trial earlier in November as well.  We just

10   understood that the second week of November was what was

11   preferred for defense counsel, and given that our estimation of

12   the trial schedule doesn't take into account any defense case

13   or whether there will be expert testimony from the defense

14   side, and some of this evidence, as defense counsel has stated,

15   is quite complicated and it will take a fair amount of

16   educating the jury about it.

17        THE COURT:  Well, counsel know better than I do about,

18   you know, what their plans are for this trial.  So I'm happy to

19   give you a November trial.  I'm going to give you a November

20   trial.  I am happy to start it on Tuesday, November 12, if you

21   can represent to me in good faith that the jury will be able to

22   deliver a verdict by November 22nd.  Otherwise we're going to

23   start on November 4th.

24        MS. FLODR:  Out of an abundance of caution, I think we

25   would prefer November 4th, your Honor.

J44ACASCps

1          THE COURT:  That sounds right to me.

2          MR. O'BRIEN:  Judge, Mark O'Brien on behalf of

3    Mr. Castro.  I am ready to go November 4th.

4          THE COURT:  And it's better for the wedding.

5          MR. VOGELMAN:  Judge, you know, I'm just telling you

6    the honest truth, what my strong preference was.  If we're

7    going to go in November, November 4th is fine, Judge.

8          THE COURT:  Thank you so much.  And I'm glad you have,

9    obviously, co-counsel available who have filed notices of

10   appearance in this case to help you with the burden of the

11   trial.

12         So we'll have the trial November 4th.

13         What I'll probably plan to do is sit five days that

14   first week, because the next Monday is a holiday.  So we'll

15   have a short week the second week.  But we'll sit five days

16   that first week.

17         I don't know if there's going to be a need for

18   hearings here.  I don't know what kind of motions might be

19   made.  What I'm thinking about is setting a motion schedule for

20   July, which would permit us, then, to have any hearings, if we

21   need hearings, in August, and then give you plenty of time to

22   prepare for trial, knowing what evidence was in, what evidence

23   was out.  I am happy to set a motion schedule, push it back

24   closer to trial if you prefer.  But I guess I need guidance

25   from defense counsel what you'd like.

J44ACASCps

1          MR. VOGELMAN:  Your Honor, the government told us that

2     there is voluminous discovery, and they just stated on the

3     record that they have to get search warrant analysis, look at

4     computers and phones.  And government told me it might be six

5     to eight weeks before we receive all the discovery.  It's going

6     to be rolling.  I think they might have some this week.

7          If I do ask for a hearing -- from what I heard, my

8     client made post-arrest statements.  We might ask for a

9     hearing, we might not.  I just got retained on the case.  So I

10     think, since we might not have all the discovery until May or

11     June, maybe we should have motions in August or September,

12     maybe August, not July.  I just don't want to, you know, be

13     squeezed when we get all our discovery, your Honor.

14          THE COURT:  Mr. O'Brien.

15          MR. O'BRIEN:  Your Honor, I would concur.  I would

16     suggest a deadline for motions in August, along with any

17     hearing date scheduled for September.

18          THE COURT:  OK.  Fine.

19          So we'll have motions due August 9th, government's

20     response August 16th.

21          Now, I want the defendants to understand, this is a

22     firm trial date.  It's not going to move.  If at any time you

23     have an inability to pay for counsel or want to retain other

24     counsel, you have to move expeditiously and make that decision

25     promptly, so that incoming counsel has an adequate time to

1    learn your case and prepare for trial.  Do you understand what

2    I've just said, Mr. Castro?

3            DEFENDANT CASTRO:  Yes.

4            THE COURT:  Mr. Fernandez?

5            DEFENDANT FERNANDEZ:  Yes.

6            THE COURT:  Because both defendants were arrested,

7    they were advised of their rights already.

8            MS. FLODR:  Yes, your Honor.

9            THE COURT:  OK.

10           So we have chosen a trial date of November 4th.  Is

11   there any objection to an exclusion of time under the Speedy

12   Trial Act until our trial date?

13           MR. O'BRIEN:  On behalf of Mr. Richard Castro, no,

14   your Honor.

15           MR. VOGELMAN:  No, your Honor.

16           THE COURT:  Thank you.

17           I exclude time from today until November 4th under the

18   Speedy Trial Act, finding that it's supported by the interests

19   of justice and outweighs the best interest of the defendants in

20   a public and a Speedy Trial.  It will permit discovery to be

21   made and evaluated, permit defendants if they wish to enter

22   pleas of guilty, to negotiate those with the government.  If

23   they prefer to go to trial, it will permit time for those

24   motions to be made and decided by the Court and for everyone to

25   prepare for trial.  I make this exclusion pursuant to Title 18

1    United States Code § 3161(h)(7)(A).

2            Give me a schedule, will you, Ms. Flodr, for

3    production of discovery.

4            MS. FLODR:  Yes, your Honor.  The government expects

5    that within six to eight weeks we will substantially complete

6    all of our discovery, aside from the treaty returns that I

7    mentioned earlier from Finland, which I understand from the

8    Office of International Affairs could take at least another

9    four months for us to receive.  As soon as we receive those

10   returns, we will provide them to defense counsel.

11           And in addition, the six to eight weeks does account

12   for the fact that we will be able to image all of the computer

13   devices that we have seized pursuant to search warrants within

14   that time frame and provide all of those images to Mr. Castro,

15   who those devices are all associated with.  But we, given that

16   we do not know at this time exactly the volume of the data on

17   these devices, we cannot estimate at this time how long it will

18   take to review all of the data off of those 24 devices that we

19   have seized.

20           THE COURT:  So do you require the defendants to

21   provide you with hard drives for the information that is being

22   placed on it?

23           MS. FLODR:  Yes, your Honor.  And we already have an

24   initial round of discovery for defendants today.  We have

25   received a hard drive from Mr. Castro, and I understand we're

J44ACASCps

going to receive one from Mr. Fernandez's counsel as well.  So

we will be very quickly able to start providing the remainder

of the discovery.  But as of today we do have discs available

for defense counsel.

            MR. VOGELMAN:  Your Honor, I have a hard drive in my

brief case.  I will give it to the government as soon as the

proceeding is over.

            THE COURT:  OK.  Good.

            So I expect discovery to be completed by May 24th.

The government is to make production of discovery on a rolling

basis so that it goes to the defendants as quickly as possible.

And the exception will be the production from Finland or

anything not currently in the government's possession.  It will

promptly make production of materials that come into its

possession later.

            Anything else, Ms. Flodr, we should address?

            MS. FLODR:  Yes, your Honor.  We have conferred with

the defense counsel on a proposed protective order for certain

of the discovery in this case.  I have a copy that I can hand

up to your Honor for your Honor's review.

            THE COURT:  Great.

            So I have signed the protective order.

            Anything else, Mr. O'Brien?

            MR. O'BRIEN:  Judge, as to the matters discussed to

this point, no, your Honor.  We did file an application for

J44ACASCps

1    bond.

2              THE COURT:  OK.  I will certainly address that.

3              And for you, Mr. Vogelman, anything else?

4              MR. VOGELMAN:  Judge, as you know, I was just recently

5    retained.  My client's mother and brother and other family

6    members are in court.  I'm going to speak to them.  If we can

7    put together a bail package, I will speak to the U.S. Attorney

8    about what we can do about that, Judge.  So I'm reserving an

9    application at this time.

10             THE COURT:  That's fine.  The defendant is remanded

11   without prejudice to a future application for bail.

12             MR. VOGELMAN:  Thank you, Judge.

13             THE COURT:  Good.

14             So you are dismissed, Mr. Vogelman and Mr. Fernandez,

15   and I will address the bail application on behalf of

16   Mr. Castro.

17             MR. VOGELMAN:  Thank you for your courtesy, your

18   Honor.

19             THE COURT:  Yes.

20             (Pause)

21             THE COURT:  OK.  I have the Pretrial Services Officer

22   report, and it includes an addendum.  The addendum is dated

23   April 4th, and it attaches an underlying report from March

24   12th.  And it recommends release of the defendant on a bond

25   under certain conditions.  I have a motion for a bond filed

J44ACASCps

1    April 3rd by defense counsel.

2             Is there consent to release on bond?

3             MR. FINKEL:  No, your Honor.  The government seeks

4    detention in this case.

5             THE COURT:  And this is Mr. Finkel?

6             MR. FINKEL:  Yes, your Honor.

7             Your Honor, of course this is a presumption case,

8    because Mr. Castro is charged with dealing fentanyl, fentanyl

9    analogues of (b)(1)(A) weight, and also charged with using a

10   firearm in connection with those crimes.

11            But even if this were not a presumption case, I submit

12   to you this would be a very close case -- a very simple case,

13   in which only remand is appropriate.  There are no conditions

14   that could satisfy this Court that the community will be safe

15   and that the defendant will return to court when asked.

16            My colleague, Ms. Flodr, went through the details of

17   the case, which are also laid out in a 20-page complaint, which

18   show that Mr. Castro was the boss of a very sophisticated,

19   carefully planned, deceptive dark web ring that sold some of

20   the most dangerous substances that are available.  Carfentanyl

21   is typically used on large mammals, such as elephants, and

22   that's what was shipped in the mail, at Mr. Castro's direction,

23   by people located here in New York City.  By doing this,

24   Mr. Castro generated, as is reported in the complaint, more

25   than $1.7 million worth of bitcoin.

1          So I would like to address first the risk of flight,

2     which is substantial here.  Mr. Castro has the means and the

3     motive and, if he is to be released, would have the opportunity

4     to flee.

5          Let me focus on the means first.  As I mentioned, the

6     government has learned that millions of dollars of bitcoin have

7     flowed through his accounts to him.  He lived in a mansion down

8     in Windermere in Florida, surrounded by his luxury cars, yet he

9     had no job.

10         And the kind of money he has, the bitcoins, are a

11    special consideration.  This is a cash that needs to be

12    transported in a suitcase or even through a bank account.

13    Bitcoins exist everywhere and nowhere.  They can be accessed

14    from anyplace on the planet that has Internet access.  So

15    there's no way that his money could be trapped.  There's no way

16    that he could be trapped.  And especially here, in a situation

17    where he was able to evade law enforcement for years by using

18    sophisticated computer techniques, he has the means to hide.

19    He has the means to flee.  This is not the normal actor.  This

20    is not a normal defendant.

21         And because he was working on the dark web, not only

22    does he know how to distribute drugs in a subtle -- in a

23    secretive way, but he also probably has the way to obtain fake

24    documents, fake passports, aliases, Social Security numbers,

25    from anyplace on the planet, because that's what the dark web

J44ACASCps

1   has.  That's what the dark web has access to.  And he knows how

2   it works, because he was one of the most prolific vendors on

3   the dark web for years.

4           In fact, he deliberately chose -- the encrypted e-mail

5   service that Ms. Flodr referenced before is based in

6   Switzerland.  It boasts that it's outside the jurisdiction of

7   the United States and outside the jurisdiction of the EU.  He

8   chose that e-mail service purposely.  He chose it to evade

9   detection.  That's what he does.  He evades detection.

10          So a GPS bracelet, a family member who will retain

11  custody of him, none of that is enough.  None of that is

12  sufficient.

13          So let's look at the motive here.  The defendant is

14  now facing a 15-year mandatory minimum.  Even under the a

15  guidelines as calculated by defense counsel in his brief, he's

16  looking at a guidelines range of 108 to 135 months, plus the

17  924(c) man. min., 168 months.  Mr. Castro is 36.  He has spent

18  no significant time in prison and he's now looking at at least

19  15 years.

20          The motive here is powerful, especially given the

21  evidence that the government now has.  When the government put

22  together its complaint, I submit to you, your Honor, the case

23  was pretty strong.  It has gotten stronger, based on the search

24  warrants that have been executed, based on the conversations

25  that Ms. Flodr referenced with the customers of the defendant.

1      And just recently, your Honor, based on a search warrant

2      returned from Mr. Castro's iCloud account, the account that is

3      hooked into his cellphone, the cellphone that was found on him

4      on the day he was arrested, in his photo library, next to

5      pictures of his children, next to pictures of him and his

6      common-law wife, were addresses of the recipients of some of

7      the packages that the government is aware that Mr. Fernandez

8      sent.

9              In other words, your Honor, the FBI and law

10     enforcement officers have spoken to the people in his phone,

11     whose addresses were in his phone, next to language that says

12     "50 mg rhino," or "250 mg rhino."  Clearly a reference to

13     drugs.  It's essentially a smoking gun.

14             Now it is true, of course, that the defendant has

15     family in the United States.  He has some connection to the

16     United States.  But he has the means to flee and then send for

17     his family later.  $1.7 million is enough to do that.  It's

18     enough to pay back his family members should the government

19     seize the property that Mr. Castro's attorney said should be

20     put up as collateral.

21             And then we should also look at Mr. Castro's history.

22     He has one arrest and one misdemeanor conviction for reckless

23     driving, 2008.  And for that minor charge, two bench warrants

24     were issued.  When facing a misdemeanor, two bench warrants

25     were issued.  He's now facing four extraordinarily serious

1     felonies and a 15-year mandatory minimum.

2          With respect to danger to the community, the nature of

3     this crime is significant, your Honor.  As I mentioned and

4     Ms. Flodr has mentioned, the substances that were sent through

5     the mail, at his direction, are extraordinarily dangerous, and

6     they posed a danger to every community that these letters

7     flowed through, communities throughout the entire United

8     States, where customers were in Hawaii, where customers were in

9     California, in New York, in Florida, in Louisiana, everywhere.

10    Every postal carrier who carried those package was exposed.

11    Every innocent person who picked up the package for their

12    friend or their neighbor was exposed.  And there is no

13    condition, none, that this Court can impose that can prevent

14    the defendant from continuing to commit his crimes, because all

15    he needs is a cellphone.  That's how he operated his drug ring,

16    through a cellphone.  And there is nothing, nothing that this

17    Court can do, short of asking him not to commit crimes, that

18    will prevent him.

19         In addition to the drugs, your Honor, there is the

20    guns.  There were nine weapons found in his home, eight of

21    which appear to be legal.  But the ninth one was not.  And

22    that's this gun, your Honor.  And I can pass this up if you'd

23    like.  This is a modified assault weapon that, under the

24    National Firearms Act, should be registered.  It was not

25    registered, at all.  He had an arsenal in his house, used --

1  apparently there to protect himself, to protect the currency

2  that was in his house, the precious metal that was in his

3  house, and the bitcoin wallets, the bitcoin accounts, the

4  passwords.

5      Now, your Honor, I understand that pretrial has

6  recommended release with conditions.  I submit to you that, in

7  this case, pretrial -- they usually get it right -- in this

8  case they got it wrong.  The defendant is the head of an

9  extremely sophisticated and dangerous dark web ring.  The

10 community can't be safe.  And there's no guarantee that this

11 Court can be satisfied that he will return, unless he's

12 remanded.

13      THE COURT:  Counsel.

14      MR. O'BRIEN:  May it please the Court, Judge, the

15 first thing that I would like to do is point out that present

16 behind me in the second and third rows of the center part of

17 the courtroom are members of my client's family.  In particular

18 his mother is present and his father is present.

19      I have not had the privilege of appearing before your

20 Honor before, so I do not know if you'll allow me to proffer

21 what I propose or if you wish to take testimony if your Honor

22 is considering a third-party custodian, but they are present.

23      Judge, what I would proffer is contained in the motion

24 that I filed yesterday.  And I do note, Judge, that I had that

25 motion prepared for some time.  I was simply waiting to be

1    allowed to file on ECF because Mr. Quijano filed a motion to

2    allow me to appeal pro hac vice, which was granted yesterday.

3    The moment that was granted, we filed the motion.  So I don't

4    want the Court to think that we were sitting on this and

5    sandbagging anyone.

6              I also presented to Pretrial Services and the

7    government on Monday the two pieces of collateral which I

8    believe your Honor has seen at this point.  If not, Pretrial

9    Services have a copy.  I have a copy.  And I could certainly

10   pass that up for your Honor's review.

11             Judge, I'll start --

12             THE COURT:  You know, I'm not sure what you are

13   referring to when you say "the two pieces of collateral."

14             MR. O'BRIEN:  Judge, I have in my hands, and if your

15   Honor will allow me to pass them up, I have the two pieces of

16   properties that I have offered as collateral.  They are set

17   forth in my motion, but I did not put them as an attachment

18   because of the personal identification information contained --

19             THE COURT:  Sure.  You can hand those up to my deputy.

20             MR. O'BRIEN:  May I approach?

21             THE COURT:  Sure.

22             MR. O'BRIEN:  And I'm showing opposing counsel the two

23   pieces of property that I had previously provided both pretrial

24   and the government.

25             Showing Pretrial Services.

1    THE COURT:  So these are two sets of documents that

2  have pictures of and distribute information about two pieces of

3  property.  One is in Windermere, Florida.  And the other is in

4  St. Cloud, Florida.

5    MR. O'BRIEN:  Yes, your Honor.  The St. Cloud property

6  is owned by Nelson Castro, who is -- Mr. Castro, if you could

7  just stand up so the judge can see you.

8    Judge, he's in the front row from your vantage point

9  on your left.  Mr. Castro owns that property.  He lives there

10  with his wife.  It does have the mortgage, as you see, that has

11  been attached to that document.  However, Judge, that is his

12  only residence.  Should that residence be taken from him, he

13  would officially be homeless.

14    As to the Windermere property, that belongs to his

15  mother.  She is sitting to Mr. Castro's left from your vantage

16  point.  That is Maria Castro.  That is her retirement property.

17  She is at the tail end of a very proud career serving a state

18  court criminal judge as a judicial assistant.  When she

19  retires, which is going to be fairly soon, she is going to

20  retire to Windermere, Florida, and live in that property.  She

21  owns that property outright, Judge.  There are no encumbrances.

22  And that is also set forth in the documents that we provided to

23  the county appraiser.

24    Judge, both of those properties total about, by my bad

25  math and according to Zillow, which is an online real estate

1    tool that provides estimates of value, we're looking at --

2    ma'am and sir, you may sit -- we're looking at about 560 to 600

3    thousand dollars.  Now, in terms of equity, we probably have

4    about two thirds of that, because, again, Mr. Castro's house is

5    mortgaged, while Ms. Castro's home is owned outright.

6         Judge, he has strong family support, meaning Richard

7    Castro, has strong family support, both in New York and in

8    Florida.  Present are folks from New York.  He has folks in

9    Florida that could not travel up here due to work purposes and

10   school purposes.

11        I would note that his family, meaning his longtime

12   domestic partner -- he calls her his wife.  They've been

13   together since they were 13 years old.  They share four

14   children together.  There is one on the way.  His wife is due

15   sometime in July of 2019.  They are all school-age children.

16   If your Honor were to grant release, we would be very apprecia-

17   tive.  If your Honor were to grant release and ask us where we

18   would prefer that he live, obviously I would prefer, from a

19   professional standpoint, that he live in Florida.  I have a

20   main office in Tampa, a satellite office in Orlando.  He is

21   almost splitting the difference, in terms of getting to either

22   location, based on either location that he can live in Florida.

23        I also would note, Judge, that if your Honor were to

24   grant his release -- and we're not assuming that you are -- but

25   if you were to grant his release, I would submit to the Court

1    that he has a lot of family in Florida that can keep an eye on

2    him.  He also has, again, four school-age children.  We would

3    hate for them to have to leave school and move to New York

4    midway through the school year.  Or, in the alternative, we

5    would hate for Mr. Castro to be separated from his family.

6         I would note, Judge, that, in terms of this case --

7    and I was candid with the Court in my motion, and I know your

8    Honor read it -- I have yet, in 17 years of practicing in

9    federal court, heard a prosecutor say that their case is not

10   strong.  And this case is no different.

11        I will also submit, because I want to earn credibility

12   before this Court, it appears their case is fairly strong.

13   Count Four they may have an issue with, in terms of these guns,

14   because Mr. Castro is not a felon.  In the State of Florida, he

15   is allowed to buy guns.  He belonged to the Orlando Gun Club,

16   and he was and avid gun collector.  He liked to go shoot guns.

17        The government has made the argument that these guns

18   were necessary to protect his drug money, essentially.  And in

19   the typical case that may be correct, but in this case the

20   government has already told your Honor that this is

21   cryptocurrency.  The government admittedly stated he's not

22   running around with bags or suitcases full of money.  There

23   were $7,000 in cash in his house.  I submit to the Court that,

24   while $7,000 is certainly nothing to sneeze at, it does not

25   take an arsenal to protect.  I submit to the Court it is more

likely that Mr. Castro simply liked guns.  He was lawfully

allowed to have guns, and in the State of Florida, when you

legally purchase the guns, that is acceptable.  He had a carry,

his carry concealed firearm permit, which I know is a bit

different from state to state.  It is not an open carry.  It is

a concealed carry.  But he had that.  That is not in dispute, I

don't believe, by either party.

So I also submit to you, Judge -- and I was candid

with the Court in my analysis of the guidelines -- there are

significant penalties in this case.  But in my opinion, your

Honor, that is cause for him to, should he not opt for trial --

the only way -- and this Court knows this, the government knows

this, and I know this, and Mr. Castro is aware of it because I

have informed him -- there is only one way that he can get

below a mandatory minimum penalty.  And because of his role in

the offense and the firearm, it is not the safety valve.  And

everyone in this courtroom knows what I'm referring to, which

is the only way left.

So I believe, your Honor, it is in his best interest

to make sure that he abides by all the terms and conditions of

this Court, should it grant release, because he may be in a

position, if he wants to do one day less than 180 months, he

may have to try to please the government going forward.

Now, we haven't reached that stage yet.  I don't have

one piece of discovery.  But I have been doing this a while.

1    And I can look at a case on its face and realize that we have

2    an uphill battle.

3         I would also submit to the Court that, in terms of the

4    risk of flight -- which, along with dangerousness to the

5    community, is really the two big factors here today.  Let's

6    talk about risk of flight for a moment.  The government has

7    emphasized that he had $1.7 million worth of bitcoin.  But what

8    the government didn't mention is that bitcoin has fallen in its

9    value in recent months.  And while at one point at its height

10   it was, I believe, one bitcoin was worth approximately $22,000,

11   I believe if you look now, it's less than $4,000.  So I dispute

12   that right now currently he has somewhere, in this

13   cryptocurrency world, almost $2 million, which he can take,

14   access all these fake documents, and travel someplace where

15   there is no extradition.  I think that that's a little foolish

16   at this point.  The gig is up for him.  He is not a mastermind

17   criminal with a history of doing horrible things.

18        In the light most favorable to the government, if he

19   committed the crimes as alleged, that is now over.  And I will

20   say to the Court that that is supported by the fact that the

21   government has seized the -- in the course of their search

22   warrants, the only way he can access the cryptocurrency has

23   been taken by the government.  He has no access to any money,

24   no matter what the value is.  If it's 1.7 million or something

25   less, as I proffered to the Court, he does not have access to

1    it.

2             I will also say that his parents --

3             THE COURT:  Now, explain to me why that's so.

4             MR. O'BRIEN:  It gets complicated, Judge, but in the

5    cryptocurrency world, it's kind of -- I don't want to say it's

6    make-believe money, but it's money that's often in the cyber

7    world.  It's not tangible.  In other words, if he was perhaps a

8    drug trafficker in the old-fashioned use of that term, he would

9    have 1.7 million in cash lining his refrigerator or microwave

10   or hidden underneath the bed or whatever stash house or secret

11   compartments in a vehicle.  That's not what the government is

12   alleging in this case.  They're alleging that all of his money

13   was through cryptocurrency, bitcoins and other currency.

14           Because the government seized his ability to access

15   the web with what it takes to go online and make transfers or

16   make withdrawals, he doesn't have the ability to log in and

17   access that money anymore.  It's as if they seized the cash

18   when they arrested him and conducted the search warrant.

19           THE COURT:  So he can't use another device?

20           MR. O'BRIEN:  He doesn't have the ability to do that,

21   your Honor.  It was written on a piece of paper.  It's gone.

22   He doesn't have that.

23           THE COURT:  So if he has a number that was written on

24   a piece of paper he could use another device.

25           MR. O'BRIEN:  Yes, your Honor.  And absolutely I

1  concede that.

2      I also am just proffering to the Court that they have

3  seized the ability for him to do that.  So in my mind this is

4  the old-fashioned drug case where the government comes in,

5  surprise, knocks on the door, seizes everything in there, the

6  person is left with nothing.  That's what I submit is going on

7  here.  It's just a different type of scenario.

8      Now, as to what we would do going forward, I certainly

9  appreciate pretrial's recommendation.  And I know under

10  statute, if your Honor is willing to grant release, it should

11  be the least restrictive means.  However, I'm also conscious of

12  the fact that the government has raised, in the light most

13  favorable to them, valid points.  So what I suggest your Honor

14  do is institute a couple of additional terms and conditions to

15  assure his appearance.  Number one, if your Honor is gracious

16  enough to allow him to be released, either he can stay in New

17  York with his mother or he can go to Florida, stay with either

18  his father or an empty house, which would be preferable, that

19  his mother owns, to stay with his wife and his children, his

20  pregnant wife and his children.  If that's not acceptable to

21  the Court, Mr. Castro, his father, has agreed to allow him to

22  stay in his home.  He has also agreed to be a third-party

23  custodian.  He has no pets.  There are no firearms.  And he

24  does not have a criminal history, outside of, I think there was

25  an arrest for a larceny of some sort 20 years ago that I don't

1    believe resulted in any actual conviction.

2              As to an additional third-party custodian, his mother

3    is willing to do that.  If your Honor wants two, she is willing

4    to do that.

5              I took great pains before court today to explain to

6    both that, should Mr. Castro get so much as a speeding ticket,

7    they must call Pretrial Services and they must notify them that

8    he has violated the terms and conditions of his release.  They

9    have to act as, essentially, eyes of the Court.  They are

10   willing to do that.  They are willing to turn their son in,

11   should he so much as just step out of line a little bit.  They

12   all understand that, if your Honor requires collateral,

13   requires a secured bond, in whatever amount secured by their

14   properties, that should Mr. Castro not appear, they will lose

15   their homes.  The government has the ability to seek them and

16   take them.  And they are willing, despite that warning, to

17   offer both of their properties as collateral.

18             Now, I would point out, Judge, and I think this is

19   worth emphasizing twice, if Mr. Castro loses his home, he has

20   nothing else.  If Mrs. Castro loses her moment, she has lost a

21   major part of her retirement and a place to go when she does

22   retire.  The home she lives in here in New York is not hers.

23   She rents it.  So her, all her eggs are in Florida.  So if she

24   loses that home, she too will not have a place to go.

25             So that's how serious they take this matter.  That is

1  the amount of risk they're willing to accept.  And, Judge, I

2  submit to the Court that, outside of this case -- and I know

3  that, on the face of it, it's serious, and I don't dispute

4  that.  But outside of that, this is an individual that appeared

5  to have some sort of speeding ticket that for whatever reason

6  escalated into a misdemeanor.  I asked my client about the

7  circumstances of that.  He was going 80 miles per hour on the

8  Hutchinson Parkway going southbound in a 50-miles-per-hour

9  zone.  And it appears he was arrested on a reckless driving,

10  which evidently, in the State of New York, is a misdemeanor.

11  He ultimately pled, I believe, to a misdemeanor.  That occurred

12  when he was 25 years old, in 1996.  Other than that, nothing.

13       So I would submit to the Court that this is an

14  individual that can be trusted at this point to abide by any

15  terms and conditions this Court imposes.  He is not a danger to

16  the community because whatever, again, in the light most

17  favorable to the government, there is no jury here, whatever he

18  was doing before, it's done.  It's over.  The gig is up.

19  Everyone is going to be watching him, including his own family.

20       And, number two, Judge, he has no financial ability.

21  He can't flee.  He doesn't have a passport.  He's been out of

22  the country one time in his entire life.  It was in 2011, where

23  he went on a cruise with his family.

24       And these are people, again, judge, that understand --

25  I talked to all of them before court.  They understand that,

should he do something stupid, it is their requirement to tell the Court. And they all agreed they would. They all understand it. So does Mr. Castro.

Judge, I submit to the Court that this case will go a lot easier from our perspective -- and I know that's not the Court's main concern, but it's a lot easier if I can sit down with Mr. Castro in my office with my investigators and explain to him in person the amount of evidence that's against him. And I believe at that point, Judge, Mr. Castro is probably going to do the right thing. And I don't believe there will be a trial in this matter.

Now, that's not to say that there would be a different result if he's in custody. It's just all that much harder to meet with a client in custody. It's harder to bring electronics in. It's harder to explain things when there's noise and clamoring going on in the back. That is just one factor that I submit to the Court. It's not a main factor. I understand risk of flight and danger to the community are the number one and two factors that this Court is to consider. But I believe at this point, with the collateral, two pieces of collateral, and third-party custodians, and any other term and condition the Court wishes to impose, to include ankle monitoring or GPS monitoring, overcomes the presumption and I believe, Judge, eliminates the risk of flight and the danger to the community. Whatever he was doing, Judge, it's done. He

1  now is going to face the consequences and attempt to lower his

2  sentence so that when he gets out of prison, his children are

3  not grown.  That's the only chance he has.

4  If the Court has any questions for me, I'd be glad to

5  answer you.

6  THE COURT:  Thank you.

7  MR. AHMED:  Your Honor, may I approach the bench?

8  THE COURT:  Sure.

9  (Discussion held off the record at the bench)

10  THE COURT:  The Pretrial Services Officer understood

11  your client to have told him that he has access to his funds.

12  So I just want to let you know what I was told here.

13  MR. O'BRIEN:  Yes, your Honor.

14  MR. FINKEL:  Your Honor, may I respond to a few --

15  THE COURT:  Sure.

16  MR. FINKEL:  Thank you, your Honor.  I'll be brief.

17  Sort of a threshold matter.  I don't think anything

18  defense counsel has said has rebutted the presumption in this

19  case.  And it is of course a presumption case.

20  THE COURT:  Well, no.  I think that's not the right

21  test.  Even in a presumption case, the burden of production is

22  on the defendant.  Initially, I'm going to find, with the bail

23  package that he's presented, that he's borne that burden.  So

24  the burden of persuasion now shifts to the government.

25  And with respect to danger to the community, you have

1    the burden of persuasion by clear and convincing evidence.

2    With respect to risk of flight, you have the burden of

3    persuasion by preponderance of the evidence.

4              MR. FINKEL:  Yes, your Honor.  I think we've met those

5    standards.

6              Defense counsel's chief argument is that putting up

7    $400,000 in equity is enough to protect the community and is

8    enough to assure his client's appearance.  And he bases that on

9    his proffer that whatever money Mr. Castro has isn't a lot.

10             The Pretrial Services report, what he told pretrial

11   about, is that he has $100,000 in cryptocurrency.  That's what

12   it says in the Pretrial Services report.

13             It also says that he pays $1800 a month for a Tesla,

14   $1400 a month for two -- $1400 each -- for two Camara Revro

15   cars.  I'm not sure what those are.  $4500 for a Lamborghini,

16   $800 for a Range Rover, $6300 in rent.  He has a lot of money.

17   A lot.  And maybe the government got some.  But who's to know

18   if we got it all?

19             Here's what we do know.  As Ms. Flodr mentioned, we're

20   seeking information from a cryptocurrency exchange based

21   abroad.  The defendant is smart.  He's sophisticated.  He moved

22   money around to multiple cryptocurrency exchanges throughout

23   the world.

24             He's charged with money laundering.  He's trying to

25   conceal where his money came from.  And one of the ways to do

1    that is to put it in places people won't look.  And your Honor

2    understood this explicitly.  If he knows the password, that's

3    all he needs.  He can log in from anywhere and have access to

4    any of it.

5         Has bitcoin value dropped over the last couple of

6    years?  Yes.  Is it still substantial?  Absolutely.

7         And of the 1.8 million, how much has been converted

8    into other currencies, or other properties, as the government

9    has alleged here?

10        And frankly, your Honor, I certainly appreciate that

11   his family is here to support him.  They don't understand that

12   he has lived a double life for years, a life in the shadows, in

13   which he has hid, not just from law enforcement but from them,

14   selling drugs secretly, selling drugs behind sophisticated

15   software, VPN blockers, spoofing IP addresses, figuring out

16   ways to hide, figuring out ways to use e-mail accounts that are

17   based in Switzerland so the government can get access to them.

18   He knows what he's doing.

19        Mr. O'Brien also mentioned a bit about Count Four, the

20   924(c) charge.  Your Honor, let's be clear.  If the government

21   executed a search warrant on an individual in the Bronx and

22   they found $16,000 and a handgun and he was also selling drugs

23   a 924(c) charge would of course have been brought.  There's no

24   difference here.  The difference is, in addition to $17,000 in

25   cash, about 6,000 of which was in his car, by the way, $17,000

J44ACASCps

1    in cash in his home, nine guns, he also had precious metals, he

2    also had passwords to bitcoins.

3            And he may have a license to carry certain guns.  Some

4    of the guns were legal.  But not all of them.  He had an

5    illegal firearm.

6            THE COURT:  Well, the 924(c) doesn't require that the

7    gun be without a permit.  Right?

8            MR. FINKEL:  That's absolutely right.  What I would

9    submit to the Court is because one of the firearms was illegal,

10   it is more evidence that they were used for illegal purposes.

11   But the Court is correct; even a legal firearm could be used

12   for a 924(c) charge.

13           So, your Honor, at bottom, I believe the government

14   has shown that there are no circumstances that this defendant,

15   who has access to money that could be accessed anywhere, who

16   has the know-how that he has used, over the period of years, to

17   obey law enforcement, he has the ability to flee.  He has the

18   motive to flee.  All he's looking for is the opportunity.

19           And with respect to danger, your Honor, as I mentioned

20   before, there is no condition this Court could impose.  We

21   don't know what other drugs he might have hidden.  We don't

22   know what else he might be selling, where he would do it.  What

23   we know is he can do it.  He can do it with just a phone.

24           MR. O'BRIEN:  Judge, the prosecutor raised two issues

25   that are new that I didn't have a chance to address.  With the

1  Court's permission, may I briefly address them?

2              THE COURT:  Yes.

3              MR. O'BRIEN:  Judge, regarding these cars, they're

4  leases, and those cars have been turned in.  Listen, again, I

5  want to keep credibility with the Court.  He was doing

6  something illegal and he was doing silly things with that

7  illegal money.  That's over.  He doesn't have those expenses

8  anymore.  He also doesn't have the expense of $6300 a month for

9  a rental home.  He's going to be living with one of his two

10  parents.  So that expense is out the window.  His experiences

11  are very little.

12              I just want to go back to the cryptocurrency because

13  it's complicated, it's new.  In order to access, it's not just

14  a passcode, like someone would log into their computer to

15  access, you know, the home screen.  This, you need two things.

16  You need a bar code, and then you need a 25-character passcode.

17  So you need two different things in order to log in and access

18  this cryptocurrency.  My client is not Rain Man.  He doesn't

19  have that type of memory.  He just doesn't have the ability to

20  access it.

21              But if the Court is really concerned about it, let's

22  take away his ability to access the Internet.  Let's tell his

23  father, if you have Internet in the house, get rid of it.  And

24  he also should not have access to any sort of cellphone if the

25  government is concerned about that.  And we'll submit to random

J44ACASCps

1    searches by Pretrial Services in Orlando.  I think that those

2    concerns can be addressed by the concerns that I have proposed

3    to the Court.

4         So I just wanted to note, Judge, that his expenses are

5    significantly less than they once were, down to almost nothing.

6    And the passcode is not just 2345.  I mean, it's a significant

7    passcode that he had to have written down that the government

8    has in their possession.  They could log into his account.

9    They could seize his money.  And I imagine they're trying to do

10   that right now.  And they just probably haven't done it yet.

11   And, again, Judge, I submit that we could take away Internet

12   access, which, his father is nodding up and down saying that he

13   will do that.

14        So, Judge, again, I think we, the Court found we met

15   our burden, and I don't think the government has overcome it.

16   Thank you, your Honor.

17        MR. FINKEL:  Could I actually just be heard on these

18   three points that defense counsel raised.

19        The reason, your Honor, that I pointed the Court to

20   the cost of the cars and the house is not to say that those are

21   ongoing expenses.  It's to show that, very recently, he was

22   meeting his obligations, which means that he had a lot of

23   access to liquid capital.  Whether that was through

24   cryptocurrency, cash, what have you, it shows that he made a

25   lot of money.  And I raise that to rebut defense counsel's

1    assertion that he doesn't have a lot of money.  I think the

2    Pretrial Services report rebuts that.  That's point number one.

3         Point number two, there are a lot of ways to access

4    cryptocurrency.  One them is what defense counsel mentioned: a

5    long string of passwords that I agree would be very difficult

6    for anyone to memorize.  But that's not the only way.  You can

7    access cryptocurrency through currency exchanges, which, to log

8    in, require nothing more than a user name and password, just

9    like logging into a Gmail account, your computer itself,

10   anything else.  And there very well may be other cryptocurrency

11   accounts the government doesn't know about.  And I suspect

12   there are.  Because we know that he accessed and used multiple

13   currency exchanges located in multiple countries for multiple

14   different dollar amounts.

15        And an order from the Court that he can't use a phone

16   or can't access the Internet, your Honor, I submit to you that,

17   frankly in this day and age, that isn't really enforceable.

18   Phones are everywhere.  The Internet is everywhere.  On the

19   street corner, on virtually every block now in the city is a

20   public terminal in which anyone can access the Internet, log

21   onto a cryptocurrency account, log onto anything else.

22        THE COURT:  Thank you, counsel.

23        So, as I mentioned, in this presumption case, I find

24   the defendant has met his burden of production, and while the

25   presumption remains in my analysis, the burden shifts to the

1    government under the standards I already laid out on the

2    record.

3          The Second Circuit in *Mercedes*, 254 F.3d 433, has

4    described the process I must go through in addressing this

5    disputed bail application, essentially imposing the burdens

6    I've already described.  I should consider the factors set

7    forth in 3142(g).  There are four factors.  Let me do that now.

8          The first is, I must consider the nature and

9    circumstances of the crime charged.  Here, it's the crimes

10   charged.  These are very serious and dangerous crimes that were

11   widespread in their impact across the country, with shipments

12   of extraordinarily dangerous drugs.

13         The second factor is the weight of the evidence

14   against the defendant.  The government has described

15   significant evidence from a variety of sources.  There is no

16   ultimate dispute here that it is a strong case against the

17   defendant.  And it appears that the government's investigation

18   has only begun, or is continuing, I should say.

19         The third factor is the history and characteristics of

20   the defendant, including family ties, employment, community

21   ties, and past conduct.  There it's a more mixed picture.  He

22   has strong family ties.  There is a significant presence in the

23   courtroom of many friends and relatives.  And they profess

24   their support of the defendant.

25         In terms of employment, he has no significant

1  employment history.  It appears that he was engaged in this

2  criminal activity and supporting himself and his family, and

3  living a lavish lifestyle and doing so.

4         Community ties, I think those are strong.  He's lived

5  in one place.  His children are in school there.  He has strong

6  community ties.

7         Past conduct, there is no serious criminal history

8  record here.  The most serious thing about his criminal history

9  record is the bench warrants, which suggest, even though he was

10  facing a misdemeanor, he did abide by his requirements to

11  respect the orders of the Court to appear and respond to those

12  charges.

13         The fourth factor is the nature and seriousness of the

14  danger to the community or to an individual.  I don't think

15  this is hard to assess.  The danger here is significant.  The

16  danger of the past criminal activity is significant.  It was

17  conducted not through the hand deliveries of drugs but through

18  the use of the Internet and co-conspirators apparently.  This

19  is the kind of conduct that can occur, if one is released from

20  custody, easily.

21         So with respect to the issues that I didn't pick up

22  directly in reviewing those four factors, there is a strong

23  motive to flee here, I also think a strong motive to interfere

24  with the government's case, to the extent he has known

25  associates.  He is facing a 15-year mandatory minimum term of

1  imprisonment.  Who knows what the guidelines range will

2  ultimately be, but it's not in dispute that it is at least in

3  that range also of 15 years.

4        And, you know, it's harder for me to assess the

5  likelihood of flight, because the defendant's ties are so

6  deeply rooted here in New York and in Florida with family

7  members, and it's hard to move your entire family abroad, even

8  while motivated and with lots of money.  There are enormous

9  benefits to living in America, I like to think, I think we all

10  think.  So that's a tough decision to separate one's self and

11  one's family and uproot them if they come with you.

12        But in terms of danger to the community, I find the

13  government has met its burden of proving by clear and

14  convincing evidence that a significant danger continues to

15  exist.  This was extraordinarily dangerous activity.  Lives

16  were at stake from use of these dangerous drugs.  And so I am

17  going to remand the defendant.

18        Mr. O'Brien, is there anything else we need do?

19        MR. O'BRIEN:  No, your Honor.  That concludes my

20  business before the Court.

21        THE COURT:  Thank you.

22        Ms. Flodr?

23        MS. FLODR:  Nothing else, your Honor.

24        THE COURT:  Thank you.

25        (Adjourned)